Mr. Demery. Yes, your honor. You may proceed when you're ready. Thank you. If it may please the court. Your honor, my name is Luke Demery. I'm here on behalf of the appellant Jeremy Heuton. Mr. Heuton drove out separately and is in the gallery today. It's seldom that an actual party has an opportunity to articulate their position before a circuit court of this magnitude, so in a little unusual fashion I'm going to commence my summary or statement of the facts with a and this is from the record at page 141, the appendix. In Mr. Heuton's correspondence to his doctor, in this case, referencing his note that he obtained verbatim for what Ford had instructed him to get in regard to a release to return to work, Mr. Heuton states the bad thing about it is they used the doctor's note against me. They had me get the note just so they could use it against me, in my opinion. Mr. Heuton had stood in line for over 10 hours to submit his application to Ford Motor Company. This is an unusual case. The case that I took because this individual, unlike most of the complainants that I see in these types of cases, he just wants to work. He's a remarkable individual that just wants to work. Mr. Heuton, and that was from the record at 25, Mr. Heuton identified his congenital defect, a missing left arm and hand from just below the elbow on each of Ford's forms in the application process, that's the appendix at 527 through 533, but Mr. Heuton passed all of Ford's testing. This is from the appendix at 105. Heuton then received a call from Ford's nurse, Patton, who told Heuton that he needed to obtain a letter from his doctor stating that he could not grip with his left hand, it's from the appendix at 105, and telling him if he obtained this letter, Ford was going to give him a letter. That's from the record at 27. It's undisputed that none of Ford's forms ever identified that Heuton cannot grip. This is a classic, classic perception case. Fortunate for Mr. Heuton, his doctor, Dr. Davis, was friends with the head of Ford Motor Company's medical department, Dr. Kutch, and when Dr. Davis contacted Dr. Kutch, Dr. Kutch then told Heuton's doctor that he only needed to get a letter that states that he cannot grip with his left hand. Unfortunately for Heuton, Dr. Kutch held some very profound perceptions about Heuton's disability. When I'd opposed Dr. Kutch and her responses, she states, in his case, it's pretty obvious he can't do certain tasks, so that needs to be delineated and specified in a specific manner, in the form of a restriction from his personal doctor. I'm going to get to this later, but I don't know that anybody else sees it, but my perception of the case is that Ford has devised or believes that there's a way to just simply skirt or avoid the statute altogether if they turn a blind eye or if they don't conduct an individualized assessment. The examination went on and I asked, well you said it was obvious he can't perform certain tasks, correct? The response was yes. So what tasks is it obvious Mr. Heuton can't perform? The head of Ford's medical department responds, he's missing his left upper extremity below the elbow, so he has no hand. So he cannot do gripping, grasping, fine motor tasks with the missing appendage. I asked him, how do you know Mr. Heuton can't do gripping, grasping with his left appendage? And the response, again, I haven't evaluated him. This would be when I say obvious, it was a classic perception case. Based on Dr. Kutch's assumption, Dr. Kutch then amended Heuton's medical form to state left hand no gripping and Ford denied Jeremy Heuton employment based on the fact that Heuton, or the presumption that Heuton could not grip with both hands. The punchline is that Jeremy Heuton can actually grip with his left appendage. Let me ask you this. I get, one of the things I find a little confusing about this case, and maybe I'm just not understanding it correctly, is why is it brought as a regarded as case as opposed to Mr. Hutchins has a disability, Mr. Heuton has a disability? Is it because he I guess I'm a little bit trying to figure out why we're talking about regarded as, as opposed to just straight, he has a disability and wanted Ford Motor Company to give him a job that would accommodate that disability. And your Honor, thank you for the question, and I do understand what the court's looking for. The dilemma that we ran into, and it is the fact that Mr. Heuton himself, he'll say, no, I'm not disabled. I have this capacity, you know, I may only have one other persons. And so it put us in a real position. When we originally filed, his original EEOC complaint actually makes claims under the ADA. When we originally filed, we filed as a disability claim as well. But our opposing counsel was very astute in pointing out that he doesn't consider himself to be disabled. You know, he's willing to get over the fact that he's missing an arm, and in fact works most persons in most of the jobs that he's had in the past. So, so basically that it's because he did not consider himself disabled and did not ask Ford Motor Company to hire him in spite of the disability or with an accommodation. Well, so the accommodation, I would respond differently. In Ford's forms, Ford even asked, is there any restriction? Is there any problems that you would have? Is there any type of, and I don't believe that they use the word accommodation, but it's the accommodation question. And Heuton responds and says, well, yes, I only have one hand. He made the same request when he was doing the test to say, you know, it might be that this takes me a little longer because I only have one hand. Counsel, isn't the real problem here the the lack of evidence as to the inability to perform a large class of jobs as opposed to the particular job that he applied for? And thank you, Your Honor, and I believe, and if I were to reorder my argument, I'd put point to subsection D all the way up front and say we meet that burden. We met that burden even in our oral argument before Judge Sachs. So, first and foremost, the evidence is there. The evidence will show the court that the head of Ford's medical department, such as the quote that I read, had this perception about Heuton and his ability she not only had the perception, she went on and she acted on that perception. The head of Ford's HR department had the same perceptions. If the court looks to the regulation, and this is 1630 and I believe it's subsection J, but the regulation goes on to say that one of the life activities that's considered is, and I'll get it here in a second, it's also performing manual tasks. And if you look at every single one of these statements from Ford Motor Company, really what they're talking about is exactly that, about performing manual tasks. And so Heuton meets this burden. He can show that the head of Ford's medical department had this perception. He can show that the head of Ford's HR had this perception. That their experts, this Dr. Sprecher, had this exact perception. The problem that we ran into, your honors, was the procedural posture of this case and how this case made its way here. So, both sides filed for summary judgment and in Ford's summary judgment motion, Ford takes the exact opposite approach. Ford's summary judgment motion, in and of itself, should be enough to support or to answer the court's question. And that is that even Ford states that there's, at the time, 700 jobs and positions that were available for Heuton at the time. And they go on to say that he's not available for any of those positions. Now, when we look at the the case law in this regard, Missouri's precedent on this would be the Dougherty case. In the Dougherty case, I found it interesting that the court looks at the very same exact thing. The court, they were dealing with a police captain and the city's allegation was, well, he was only applying for one job and it was the police captain job. And so, he didn't, he failed to state a class of jobs. And the Missouri Supreme Court said, no, he actually did identify a class of jobs because the city was denying him employment for all of the officer positions. And this word positions is exactly what we're dealing with here. It was the same thing with the Peterson case, Peterson versus Ford Motor Company. And what the court looked at, again, were those positions and the number of positions that this person was applying for. And so, the problem that we ran into is that instead of briefing these issues, the issues were presented to the court simply in the format of an oral argument. And if anything, I'd ask the court to give us an opportunity to take this back and to show Judge Sachs, you know, I did my very best to stand up and to cite him to the record, to show him Dr. Kutch's statement, to show him Dr. Kutch's statement where she says there's thousands of jobs out there and he probably can't perform these thousands of jobs. I did my very best on the fly, standing in the same position that I am now, to try and identify for the court each of those positions. But what we really needed was factual citations to the record. We need a written brief submitted to the court on that specific issue, if that, in fact, was what the court was going to rule. It would have given us an opportunity not only to provide these factual statements, but also I discovered the Peterson versus Ford Motor Company case when researching for this appeal. I believe that Judge Sachs's determination would have been different had he been presented with the Peterson case. Unfortunately, the format that we were faced with was we were presenting our case on the critical issue simply on an oral argument. Both sides had summary judgment briefs. There were huge records on both sides and both sides were trying to pull from those records to try and give the court some citation. But Ford, the same attorneys, handled the Peterson case. They never identified to Judge Sachs that case was out there in the precedent. Likewise, they took great liberties with the record again and again and again during that argument. There's this notion or the statement to Judge Sachs was, well, he only applied for a single position. He only applied for a single position. They went as far as to tell Judge Sachs that he never applied for a similar position. He never applied for a manufacturing position. He only applied for a single position. And that's just simply not the case. There were 700 positions. When I tried identifying some of those for Judge Sachs, such as in Michelle Sprecher, she's their vocational expert, going through her testimony, she identified in her report 37 different job types that Mr. Huton couldn't perform. I came prepared to produce those 37 types of jobs to the court and to identify that in response to every single question, she said the same thing. I don't know what the job is. I don't know what the function is. I don't know why he can't do it other than he's missing a hand, or she called it bimanual fingering. Simple fact that she's changed their position should be evidence of Ford's perception and enough to get over or to overcome the perception element. Your Honor, I see that I'm approaching two minutes. I'd like to reserve a little time for rebuttal if there's no questions. Thank you very much. Counsel. Ms. Ellsworth. Good morning, Your Honors, and may it please the court. Jessica Ellsworth on behalf of Ford Motor Company. The district court properly granted summary judgment in this case for a straightforward reason. Mr. Huton failed to develop evidence that he came as disabled within the meaning of the MHRA. Mr. Huton has argued to you this morning, as he did in the district court, that he has an impairment and that he thinks he was treated unfairly. But as the district court noted in its opinion, that argument doesn't engage with a dispositive legal question, and that's the question that Judge Gratz's question raised earlier. Whether Ford wrongly believed that Mr. Huton's impairment substantially limited him from the major life activity of working. And the only major life activity discussed below was that of working. Mr. Huton never identified a different one, never suggested during an hour-and-a-half summary judgment hearing focused on this particular allegation that there was some other major life activity at issue. And that is why the court ruled based on the Sutton-Toyota line of cases, which have been incorporated into Missouri law through the Daughtry decision, that someone must show evidence. And this is a hard standard to meet because it requires getting into the subjective beliefs of the employer. But subjective evidence that the employer understood that the plaintiff couldn't work in a class of jobs or a broad range of jobs. Well, I guess it seems to me that the strongest argument that the plaintiff has in that regard is this O'Reilly notation that he can't do 700 assembler positions. Why is that not a broad classification of jobs? That's pretty much what the Peterson case says, isn't it? So, two responses to that, Your Honor. First, Ms. O'Reilly was considering him, and that comment is in response to the entry-level assembler position that he was applying for. And this is a single position, and the record shows that... But isn't there seven of them? 700 of them? There are 700 different, essentially, spots on the assembly line. It's two assembly lines, F-150 trucks and transit vans. And there are different positions. So, one position installs the right seat belt. One position installs the left seat belt. One position installs the headliner. But the individuals who are hired into these positions are expected to be able to rotate throughout them. They have been ergonomically designed to require use of two hands so that the repetitive activities that have to be completed at each position can be done in a way that doesn't cause stress or injury. And they have to be completed in a very short time frame. It's 53.5 seconds on one line and 80 seconds on the other line. And so, what Ms. O'Reilly looked at was whether Mr. Hooten's left no gripping restriction meant that he would not be capable of performing this particular entry-level assembler position. Of which there are 700, right? That's right, Your Honor. There are 700 different positions, but someone is hired into the entry-level assembler position. And what the district... So, I guess the question is, is 700 a broad class of jobs? I think the answer to that is plainly no. And for reasons... Let me explain to you, and then let me also talk about Peterson, which you raised. If you look at, starting with the Sutton case, in which the Supreme Court looked at whether someone could be hired as a global airline pilot. And whether, excuse me, whether being a global airline pilot was a class of jobs. And said that it's not, because someone could also work as a regional airline pilot. They could be a co-pilot. They could do all sorts of other things using pilot training. I think it's a class of jobs at a broad level. And that's what this court itself has said when it looked at the ADA in pre-2008 cases. Where it said, we're not talking about a narrow range of jobs. We're not talking about things like positions on a single moving assembly line that have been set up in a simple, simple, in a straightforward way. And that is what we have here. Peterson, as Your Honor suggested, reached a different conclusion. Peterson is neither preclusive nor persuasive. And I want to be clear on both of those points. It's not preclusive for, I think, a variety of reasons that are pretty readily apparent. It was a different perceptions of a different decision maker involving a different assembly line, in a different state, an individual with a different impairment. But on why it's also not persuasive, the District Court simply engaged in none of the analysis that is required by Sutton, by the Murphy case from the Supreme Court, and by other cases from this court, identifying what that class of jobs language means. It's a one line that says that. I think the case that the District Court did rely on, the EEOC versus BNSF case, which similarly involved a no gripping restriction. And someone who couldn't work as a, the employer perceived him as being unable to work as a locomotive electrician, and also unable to work in any other position that required three points of contact, which on a railroad, there are a number of positions that fall into that category. But what the BNSF District Court held, which the Tenth Circuit has since affirmed, is that that also was not a class of jobs. Peterson made a statement, it then went on for other reasons to give the but there simply wasn't the nuanced analysis that is required by Sutton. And that the District Court did in this case, when it tried to give practical effect to what this broad class of jobs language means. And I think my opposing counsel raised the Daughtry case. I think if you look at Daughtry, the Daughtry case in setting out that the individual there did have evidence that the employer perceived him as being unable to work in any law enforcement position of any rank. So it wasn't just that he couldn't serve as one of the many policemen who were employed by the city, but that it was any law enforcement position. And in a footnote, the Supreme Court of Missouri distinguished this court's decision in Epps. And in Epps, this court had affirmed a judgment in favor of the employer, who concluded that someone could, that the employer perceived the individual as being unable to work as a detective, but they could work in other law enforcement positions that didn't require the same particular physical characteristic. So for all of these... Counsel, does the record contain a clarification or an explanation as to what the requirements of these 700 jobs that were mentioned, what the common requirement was? So what the record, what I would point your honor to in Ms. O'Reilly's testimony, she explained that she consulted with the floor supervisor who saw this part of the plant, that she consulted with the industrial engineer who had designed these positions. She consulted with the UAW representatives and confirmed what had been her impression already, which was that all of these positions were not set up to accommodate someone who has a no gripping restriction. So her focus was very clearly on the requirements for this entry level. So they all require two hand gripping? They are all set up, that's right your honor, they are all set up in a way ergonomically designed to be done by someone using two hands to prevent against repetitive stress injuries, because they are doing repetitive tasks in a limited period of time. They do involve equipment, positioning equipment, very small parts that have to be lined up in order to get the seatbelt installed, to get the headliner installed, to get the bumper flaps properly installed. So that... And Ms. O'Reilly's testimony is very focused on the fact that she was considering this position, the entry level assembler position, this section of the CF decision aptly noted, and it relies on a number of other courts that have said the same thing. These perceived as disability claims, particularly in states that haven't changed the law in the way that Congress did change the ADA, and so the way the ADA applied prior to 2008 are extraordinarily difficult for plaintiffs to win, because it does require subjective intent showing that the employer was looking at something broader than the particular job or particular position that someone was applying for. And as the BNSF decision noted, it's not common for employers to do that. There are cases in which employers have come up with evidence like that. Daughtry is one of them, where the plaintiff did have evidence that the employer perceived him as being unable to work in a whole host of law enforcement positions. But absent that this particular job, Mr. Hutton didn't have a submissible case. The other case I'd mention in response to your Honor's questions, Judge Malloy, that I think is relevant is the Murphy case from the Supreme Court, and it followed pretty closely on the heels of Sutton. And in Murphy, there was an individual who was working as a mechanic for UPS, and he developed high blood pressure. And so he wasn't able, or the employer perceived him as being unable to get a particular health certification from the Department of Transportation that was needed to work in the particular class of vehicles that he was going to be working on. Counselor, I've got another question. I'm a little unclear as to this initial request or requirement from Ford for the doctor's note. Was it a request for a doctor's note clearing him to work, or was it a note, did they ask for a note stating that he couldn't, that he can't grip with his left hand? Or are those two separate requests? Your Honor, so my understanding, and this relates to how Ms. O'Reilly came to understand that he had a left-hand no gripping restriction. Ford's witnesses testified at their depositions that they had instructed him that he needed a doctor's note clearing him to work in an industrial environment and specifying what restrictions he had. And Ms. Kutch goes on to explain that that's because Ford doesn't want to make assumptions about what those restrictions would be. They want to hear it from the physician. Well, that's even though he disclosed, he disclosed his situation on his application. So, Your Honor, I think there are... This is a little confusing. What was, why was anything else required? Because, Your Honor... He disclosed exactly that he was born without a left hand. There's a distinction between an impairment and a disability. And an impairment, and I think everyone agrees in this case that Mr. Hooten has an impairment. He is missing part of his left arm and his left hand. But the question is, what consequence does that have in a job setting? And that's what Ford didn't want to make assumptions about. And that's what the Ford medical staff identified. It was because he had self-disclosed that they said, okay, we understand you have an impairment. We now need something documenting what it is that we need to do or what you can do. Are you clear to work in this sort of industrial environment? Mr. Hooten recalls that the first thing he received were to get a note that said he had a left-hand no-gripping restriction. Ultimately, that's really immaterial to the dispositive legal question. Because at most it could mean that Ford perceived that the consequences were greater than they were. Ford perceived, the decision-maker, Ms. O'Reilly, perceived him as having a left-hand no-gripping restriction. That is what she received when she received his file to review whether or not he would be made an offer of an employment. So you take that as you get it. The employer's perception here was that he had a left-handed gripping restriction. Now, the question is, did Ford perceive a left-handed gripping restriction, whether it's right or wrong or whether there are shades of gray that should have been included but weren't, did Ford perceive the left-handed gripping restriction to be a substantial limitation on the major life activity of working? And the answer to that is no. Mr. Hooten didn't develop evidence that showed Ms. O'Reilly looked at that left-handed gripping restriction and treated it as an impairment on anything broader than the qualifications to do the particular entry-level assembler position for which he was applying. Counsel, I have a question regarding the retaliation claim. Is it your position that Mr. Hooten did not engage in the activity, protected activity, that would give rise to a retaliation claim? Yes, Your Honor, that's part of our argument. I think there are there are two things. Mr. Hooten didn't identify below. He really spent very little time and effort on the retaliation claim. The reason I ask the question is what about a request for an accommodation? It seems to me that that is protected activity and could give rise to a retaliation claim under the Missouri Human Rights Act. So, Your Honor, I think that the key thing that the district court focused on and that really obviates the need to get into that question you've raised is whether he had any evidence of the third prong that's required, which is the causal link between a request for protected activity and an adverse employment action. He had no evidence that his request for, that any request for accommodation caused Ford to take any particular action with his employment request. That's what the response to that in his appellate brief and obviously did not raise retaliation in his argument here, so hasn't focused on that. In his brief, he seems to be saying that he objected to the request to get a doctor's note with a no gripping restriction. But I do want to be clear that the record does not show that he made any objection to that request as somehow discriminatory and never said that he was participating in protected activity by debating what the contents of a doctor's note should say. That simply wasn't something that was in the record, so there is that in addition to the lack of causal evidence that would be required and that the district court focused on. If there are no further questions, we ask that you affirm the judgment in favor of counsel have. Two and a half minutes. You may proceed. Thank you, your honors. And I'll go first to the court's queries and starting with the question as to whether or not there were any common requirements between the jobs. And this was one of the problems that we ran into in this case was that there's a form that Ford has that requires the third-party medical provider to identify that the job functions be identified to the third-party medical provider. Those were never provided in this case. In fact, I don't believe that they're being provided in any case if we take Ford's testimony as it stands. And it's that Ford doesn't want to know if they see somebody that is limited. All they want to do is to document that limitation. They don't want to know whether or not that person can actually perform the functions of the job or even perform the functions of the job with accommodation. And that's one of the issues. That's the thing that it always seems a struggle to me to try and define that or to say how I see the case. In relation to the doctor's note, and the court has this, and this was actually provided to the court in the form of an affidavit. So not only was Mr. Huton told by Ford's nurse, Patton, and you have his testimony saying that she said, all you need to do is get a doctor's note that says you can't grip. And his statement is, I got the note verbatim what Ford told me to get. But you also have the affidavit of Dr. Davis. And this is a treating physician in Missouri. And Dr. Davis' affidavit will tell you that she was friends with Dr. Kutch. When she contacted Dr. Kutch, she was told all the note needs to say is that Huton can't grip with his left hand. Moving on to whether or not Huton can actually state a claim. And again, during oral arguments, some of the things that that I directed the court to were, for instance, in Dr. Kutch's deposition testimony. She states, again, like I said, we've got thousands of jobs out there that require a variety of different movements and tasks to be performed. And if you're missing a limb, then you would not likely be able to perform certain jobs. And that's from the transcript at page 38. Ashley O'Reilly, the head of Ford's HR department, then she identifies a bunch of specific provisions, such as gripping and grasping. And as the court will notice, these are the exact types of things that in the Phantasteel v. Pizza Hut of America case, where the court added to the ADA list to say it also includes lifting and reaching. And finally, in the Sprecher, and I would urge the court to read the Sprecher transcript. And this is in the and I see that I'm out of time. If I can have just a moment to finish your thought. If the court would please look at that transcript and our attempts to identify what it is about each of those positions that it was that Mr. Huton couldn't do with his particular disability. And there are experts simply unable to identify a single one. Your Honors, we'd ask the court to send this case back to Judge Sachs, give us an opportunity to present these issues to the court, and I thank the court for its time today. All right. Thank you, counsel. Appreciate your arguments this morning. The case is submitted. You may stand aside.